SHELBY C. AND MARGUERITE G. PIERCE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pierce v. Commissioner
Docket No. 16545-88
United States Tax Court
T.C. Memo 1995-223; 1995 Tax Ct. Memo LEXIS 223; 69 T.C.M. (CCH) 2663; May 22, 1995, Filed *223 Decision will be entered under Rule 155. For petitioners: Lois C. Blaesing and Chauncey W. Tuttle, Jr.
For respondent: Mary P. Hamilton, Paul Colleran, and William T. Hayes. DAWSON, WOLFE
DAWSON; WOLFE
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: This case is part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion *224 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transaction in this case are substantially identical to those in the Provizer case. Through a second tier partnership, Efron Investors, Shelby C. Pierce (petitioner) invested in the Clearwater Group limited partnership (Clearwater), the same partnership considered in the Provizer case. Pursuant to petitioners' request at trial, this Court took judicial notice of our opinion in the Provizer case. In a notice of deficiency, respondent determined a deficiency in petitioners' joint 1981 Federal income tax in the amount of $ 24,785 and an addition to tax for that year in the amount of $ 7,436 under section 6659 for valuation overstatement. Respondent also determined that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). [2] In addition to the above deficiencies and additions to tax, in an amended answer, respondent asserted that petitioners were liable for the addition to tax for 1981 in the amount of $ 1,191 under section 6653(a)(1) for negligence and under section 6653(a)(2) in an amount equal to *225 50 percent of the interest due on $ 23,826. [3]
In her opening brief, respondent asserted a deficiency in petitioners' 1981 Federal income tax in the amount of $ 23,826 and additions to tax for that year in the amount of $ 5,791 under section 6659 for valuation overstatement, in the amount of $ 1,191 under section 6653(a)(1) for negligence, *226 and under section 6653(a)(2) in an amount equal to 50 percent of the interest due on $ 23,826. The addition to tax under section 6659 in the amount of $ 5,791 was calculated based upon an underpayment of taxes in the amount of $ 19,302 allegedly attributable to a valuation overstatement. We consider the deficiency and additions to tax reduced to correspond to the amounts in dispute as set forth in respondent's opening brief and amend the pleadings to conform to the proof pursuant to Rule 41(b). The issues for decision are: (1) Whether expert reports and testimony offered by respondent are admissible into evidence; (2) whether petitioners are entitled to claimed deductions and tax credits with respect to Clearwater as passed through Efron Investors to petitioner Shelby C. Pierce; (3) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2); (4) whether petitioners are liable for the addition to tax under section 6659 for an underpayment of tax attributable to valuation overstatement; and (5) whether petitioners are liable for increased interest under section 6621(c). FINDINGS OF FACT Some *227 of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference. Petitioners resided in Homewood, Illinois, when their petition was filed. During 1981, petitioner was general manager of engineering construction for Amoco Oil Co. and petitioner Marguerite G. Pierce was not employed outside the home. Petitioners' gross income for 1981 from wages, interest, and dividends was approximately $ 100,000 and, consequently, in the absence of significant deductions or credits, they were subject to payment of Federal income taxes in substantial amounts. Petitioner is a limited partner in Efron Investors (EI), which is a limited partner in the Clearwater limited partnership. The Clearwater limited partnership is the same recycling partnership that we considered in Provizer v. Commissioner, supra. The underlying deficiency in this case resulted from respondent's disallowance of claimed losses and tax credits that were passed through both Clearwater and EI to petitioner. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, supra. *228 [4] Those facts may be summarized as follows. In 1981, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel expanded polyethylene (EPE) recyclers to ECI Corp. for $ 5,886,000 ($ 981,000 each). ECI Corp., in turn, resold the recyclers to F & G Corp. for $ 6,976,000 ($ 1,162,666 each). F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. We refer to these transactions collectively as the Clearwater transaction. The fair market value of a Sentinel EPE recycler in 1981 was not in excess of $ 50,000. *229 PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC based on the quality and amount of recycled scrap. In 1981, petitioner acquired a 3.194-percent limited partnership interest in EI, and EI acquired a 43.313-percent limited partnership interest in Clearwater. As a result of the passthrough from Clearwater and EI, on their 1981 Federal income tax return petitioners deducted an operating loss in the amount of $ 8,944 and claimed an investment tax credit in the amount of $ 9,651 and a business energy credit in the amount of $ 9,651 for the recyclers. Respondent disallowed petitioners' claimed deductions and credits related to EI's investment in Clearwater for taxable year 1981. EI is an Indiana Limited Partnership that was formed in May of 1981 by Morton L. Efron (Efron) as the general partner and Real Estate Financial Corp. (REFC) as the initial limited partner. Fred Gordon (Gordon) is the president of REFC, which is owned by members of Gordon's family. EI was formed to acquire limited partnership *230 interests in an office building in Buffalo, New York (the office building), and a shopping center in Haslett, Michigan (the shopping center). In contemplation of these ventures, EI prepared a private placement memorandum (the original offering memorandum) and distributed it to potential limited partners. At some time in late 1981, EI abandoned the contemplated investment in the shopping center and substituted limited partnership interests in Clearwater and a K-Mart shopping center in Swansea, Massachusetts (the K-Mart investment). The revised investment objectives were presented in a revised offering memorandum (the revised offering memorandum). The revised offering memorandum indicated that EI intended to invest in 100 percent of the limited partnership interests in the office building (10 units), 43.75 percent of the limited partnership interests in Clearwater (7 units), and 15.625 percent of the limited partnership interests in the K-Mart investment (2 1/2 units). Petitioner became aware of the change in EI's investments prior to filing petitioners' 1981 Federal income tax return. The revised offering memorandum permitted him to rescind his investment, but he did not do so. *231 MFA Corp. (MFA) is the ministerial agent for EI. Efron owns 50 percent of the stock of MFA and REFC owns the remaining 50 percent. The revised offering memorandum provides that Efron, as general partner of EI, and MFA, as the ministerial agent for EI, will receive substantial fees, compensation, and profits from EI. The contemplated payments to MFA include: (1) $ 100,000 for supervisory management of the office building and ministerial fees; (2) $ 100,000-$ 125,000 as loan commitment fees; (3) $ 25,000 for note collection guarantees; and (4) a maximum of $ 100,750 in investment advisory fees. In addition, MFA was also the ministerial agent for the office building limited partnership and, according to the revised offering memorandum, received substantial payments in that capacity. Efron obtained financing for the EI investments through local banks. Some of the limited partners in EI made a cash downpayment to EI and then signed installment promissory notes for the remainder of the purchase price. Thereafter, Efron pledged any promissory notes received from limited partners as security for loans to EI. In addition to lending funds directly to EI, the banks also offered loans *232 to individual limited partners for the downpayments needed with respect to the EI investments. Petitioner subscribed to purchase 1/2 of a limited partnership unit ($ 50,000) in EI on November 10, 1981, prior to the change in EI's investment objectives. He acquired his interest in EI in exchange for a cash payment in the amount of $ 20,162.50 and a promissory note bearing interest at the rate of 11 percent per year with payments due in the amounts of $ 20,902.50 and $ 8,035 on January 15, 1982, and January 15, 1983, respectively. Petitioner borrowed all of the funds he required to finance acquisition of his interest in EI from the First Bank of Whiting through Donald Cassaday (Cassaday), a vice president of the First Bank of Whiting. Cassaday acted as petitioner's offeree representative with respect to the EI offering and certified that he reviewed the original offering memorandum with petitioner. Cassaday was involved with arranging the financing for EI with Efron and arranged required financing for some of the EI limited partners. Petitioner's arrangement with Cassaday was as follows: (1) The note was unsecured; (2) principal on the note was not due until EI's investments were *233 sold; and (3) interest payments on the note were due quarterly and were to be paid from tax refunds generated from the investment and any cash flow from the EI investments. After taking into account investment tax credits and business energy credits claimed with respect to EI's interest in Clearwater, petitioners claimed a Federal tax refund for 1981 in the amount of $ 21,446. In 1981, petitioner learned of EI and the Clearwater transaction from Efron. Petitioner met Efron through a mutual business associate at a college football game in October of 1981. Efron was the general partner of EI. In addition, Efron owned limited partnership interests in EI through Efron and Efron Real Estate, a partnership owned by Efron and his wife, and AMBI Real Estate, a partnership owned by Efron and his sister. EI was the first partnership for which Efron served as a general partner. Efron organized EI so that he could earn legal fees and fees for managing the partnership. He received compensation and fees as the general partner of EI and as a 50-percent shareholder of MFA. After EI abandoned the investment in the shopping center, Efron learned of the Clearwater transaction from Gordon. *234 In 1981 Gordon was counsel to EI, to Efron as the general partner of EI, to Efron personally, and to MFA. He and Efron have known each other since meeting at the University of Michigan in 1955. In the early 1960's Efron and Gordon began investing together in the stock market, real estate, business loans, and other investments. Gordon is an attorney who holds a master's degree in business administration and at one time was employed by the Internal Revenue Service. Prior to the date of the Clearwater private placement offering, Gordon had experience involving the evaluation of tax shelters. Gordon was paid a fee in the amount of 10 percent of some investments he guided to Clearwater; however he did not receive directly a fee from Clearwater for the EI investments. Efron was aware that Gordon received commissions from the sale of some units in recycling ventures. [5]Gordon recommended investing in the Clearwater offering to the investors in EI, as well as to some of Gordon's other clients. *235 Petitioner received a bachelor of science degree in electrical engineering in 1956 and attended a senior management program at Massachusetts Institute of Technology. At the time of trial, petitioner was the vice president of international business development for Amoco Oil Co. and had been employed at Amoco Oil Co. for his entire professional career, 38 years. Although Amoco Oil Co. has a chemical division that deals in plastics, petitioner has no direct involvement with that division. Petitioners do not have any formal training in investments. Petitioners do not have any education or work experience in plastics recycling or plastics materials. Petitioners did not independently investigate the Sentinel recyclers. Petitioner did not see a Sentinel recycler or any other type of plastic recycler prior to participating in the recycling ventures. OPINION In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case involving the Clearwater transaction and another tier partnership, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $ 50,000, (2) held that the Clearwater transaction was a sham because it lacked *236 economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers. Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that petitioner's investment in the Sentinel EPE recyclers was similar to the investment described in Provizer v. Commissioner, supra, and, pursuant to their request, we have taken judicial notice of our opinion in the Provizer case. Petitioner invested in EI, a tier partnership that invested in Clearwater. The underlying transaction in this case (the Clearwater transaction), and the Sentinel EPE recyclers considered in this case, are the same transaction and machines considered *237 in Provizer v. Commissioner, supra.
Issue 1: Admissibility of Expert Reports and Testimony
Before addressing the substantive issues in this case, we resolve an evidentiary issue. At trial, respondent offered in evidence the expert opinions and testimony of Steven Grossman (Grossman) and Richard Lindstrom (Lindstrom). At trial and in their reply brief, petitioners object to the admissibility of the testimony and reports. The expert reports and testimony of Grossman and Lindstrom are identical to the testimony and reports in Fine v. Commissioner, T.C. Memo. 1995-222. In addition, petitioners' arguments with respect to the admissibility of the expert testimony and reports are substantially identical to the arguments made in the Fine case. For discussions of the reports, see Fine v. Commissioner, supra, and Provizer v. Commissioner, supra. For a discussion of the testimony and petitioners' arguments concerning the admissibility of the testimony and reports, see the Fine case. For reasons set forth in Fine v. Commissioner, supra, *238 we hold that the reports and testimony of Grossman and Lindstrom are relevant and admissible and that Grossman and Lindstrom are experts in the fields of plastics, engineering, and technical information. We do not, however, accept Grossman or Lindstrom as experts with respect to the ability of the average person, who has not had extensive education in science and engineering, to conduct technical research, and we have limited our consideration of their reports and testimony to the areas of their expertise. We note that petitioner had a technical and scientific education and at the time of his investment in EI, held a senior engineering management position with Amoco, a large international oil company. We also hold that Grossman's report meets the requirements of Rule 143(f). Issue 2: Deductions and Tax Credits With Respect to EI and Clearwater
On their joint 1981 Federal income tax return, petitioners claimed the following with respect to petitioner's investment in EI and EI's investment in Clearwater: (1) Deductions in the amount of $ 8,944; (2) an investment tax credit in the amount of $ 9,651; and (3) a business energy credit in the amount of $ 9,651. Respondent disallowed *239 these claimed deductions and tax credits. The underlying transaction in this case is substantially identical in all respects to the transaction in Provizer v. Commissioner, T.C. Memo. 1992-177. The parties have stipulated the facts concerning the deficiency essentially as set forth in our Provizer opinion. Based on this record, we hold that the Clearwater transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Accordingly, we sustain respondent's disallowance of the deductions and credits claimed with respect to EI's investment in Clearwater.[6] Moreover, we note that petitioners have stated their concession of this issue on brief. The record plainly supports respondent's disallowance of the deductions and credits claimed with respect to Clearwater regardless of such concession. For a detailed discussion of the facts and the applicable law, see Provizer v. Commissioner, supra.
*240 Issue 3: Sec. 6653(a) Negligence
In her first amendment to answer, respondent asserted that petitioners were liable for the negligence additions to tax under section 6653(a)(1) and (2) for 1981. Because these additions to tax were raised for the first time in respondent's amendment to answer, respondent bears the burden of proof on this issue. Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994). Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. In cases involving negligence, an additional amount is added to the tax under section 6653(a)(2); such amount is equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions *241 were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Petitioner contends that he was reasonable in claiming deductions and credits with respect to EI's investment in Clearwater. To support his contention, petitioner alleges the following: (1) That he was not aware of the change in EI's investments until sometime in 1982; (2) that claiming the deductions and credits with respect to EI's investment in Clearwater was reasonable in light of the supposed oil crisis in the United States in 1981; and (3) that in claiming the deductions and credits, petitioner specifically relied upon Efron and Cassaday. Petitioner testified that after he signed the EI limited partnership agreement and the EI subscription agreement, he learned that the nature of the EI investment had changed from a strictly real estate deal to a deal including a recycling investment. Gordon testified that EI's limited partners and potential limited partners were informed of the change in EI's investment objectives with respect to inclusion of an investment in Clearwater by receipt of the *242 revised offering memorandum in December of 1981 and by personal meetings and telephone conversation prior to completion of the revised offering memorandum. However, petitioner testified that he was not aware that EI had invested in Clearwater until he received a copy of the revised offering memorandum in March of 1982. Petitioner read the revised offering memorandum and was aware of EI's investment in Clearwater prior to filing his 1981 Federal income tax return. He testified that the change in the nature of the EI offering concerned him because EI was no longer investing strictly in real estate but was also investing in Clearwater, something with which he was not familiar. Petitioner described his concern as follows: When we first invested in this Efron Investors again it was two straightforward real estate operations * * *. And those to me were very straightforward. They're certainly a risk but limited risk, the kinds of things I don't need to be an expert in to know whether it makes good sense or not and I'm willing to take a risk. And now we've introduced something that I don't know about.
Despite his concern, petitioner did not withdraw from EI. Petitioner testified *243 that he understood that he could not withdraw from EI even after being notified of the change in investment objectives. The revised offering memorandum, however, explicitly states that any money paid prior to receipt of the revised offering memorandum could be refunded with interest and that a rescission would be effected as of the date of the investment. Petitioner was an experienced senior corporate executive when he received the revised offering memorandum including the offer of rescission. There is no reason to doubt that he was perfectly capable of reading and understanding the rescission offer. When petitioner claimed the disallowed deductions and tax credits, he had limited knowledge of the plastics and recycling industries and no education or work experience in plastics recycling or plastics materials. Petitioner did not independently investigate the Sentinel EPE recyclers. In fact, petitioner did not request, receive, or read a copy of the Clearwater offering memorandum, and he claims that he merely "flipped through" the revised offering memorandum. He testified that he had "no idea" of the value of the recyclers or how EI's investment in Clearwater was supposed to *244 generate income. Petitioner argues, in general terms, that he was reasonable in claiming the deductions and credits related to EI's investment in Clearwater because of a supposed oil crisis in the United States during 1981. Petitioner contends that he believed that an investment in recycling had good economic potential because research he was involved with at Amoco Oil Co. indicated that the price of crude oil was going to rise dramatically by the year 2000. Petitioner failed to explain the connection between the price of crude oil and the Clearwater investment. In fact, petitioner was unaware of precisely how Clearwater was supposed to generate income. We find petitioner's vague, general claims concerning the so-called oil crisis to be without merit. Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the Krause case are distinctly different from the facts of this case. In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery *245 (EOR) technology. The Krause opinion notes that during the late 1970's and early 1980's the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in the Krause case were not liable for the negligence-related additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in EOR technology." Id. at 177. In the present case, however, one of respondent's experts, Grossman, noted that the price of plastics materials is not directly proportional to the price of oil, that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastic products." While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and early 1980's, there is no showing *246 in this record that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene. Moreover, the taxpayers in the Krause case were experienced in or investigated EOR technology specifically. One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. In the present case, petitioner had very limited knowledge concerning plastics and petitioners had no experience or education in plastics recycling. Petitioners did not independently investigate the Sentinel recyclers, and they did not hire an expert in plastics to evaluate the Clearwater transaction. We consider petitioners' arguments with respect to the Krause case inapplicable. On their 1981 Federal income tax return alone, petitioners claimed investment tax and business energy credits related to Clearwater totaling $ 19,302, while petitioner's investment *247 in Clearwater through EI was less than $ 11,500. [7] Therefore, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners never had any money in the [Clearwater] deal." A reasonably prudent person would not conclude without substantial investigation that the Government was providing massive tax benefits to taxpayers who took no risk and made no investment of their own capital. A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good to be true. McCrary v. Commissioner, 92 T.C. 827, 850 (1989). In fact, petitioner argues that he consulted qualified advisers and relied upon them in *248 claiming the disallowed losses and tax credits. Petitioner argues that his reliance on the advice of Efron and Cassaday insulates him from the negligence-related additions to tax. Under some circumstances a taxpayer may avoid liability for the additions to tax for negligence under section 6653(a) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Such circumstances are not present in this case. Moreover, reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); *249 Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974). We have rejected pleas of reliance when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983); Steerman v. Commissioner, T.C. Memo. 1993-447. The record does not show that any of the persons upon whom petitioner allegedly relied possessed any special qualifications or professional skills in the recycling or plastics industries. In addition, none of the persons allegedly relied upon by petitioner hired anyone with plastics or recycling expertise to evaluate the Clearwater transaction. In evaluating the Clearwater transaction, Efron contends that he relied upon (1) the offering materials, (2) Barry Swartz, an accountant, (3) various bankers who loaned funds to EI, and (4) Gordon for his expertise in taxation, finance, and investments. Although Efron testified that when making investments he knows "enough to go get an *250 expert or somebody that knows something", Efron did not consult any plastics engineering or technical experts with respect to EI's investment in Clearwater. Efron relied heavily upon Gordon in deciding to include Clearwater as a part of the revised EI offering. Efron was aware that Gordon was an offeree representative, and received commissions as such, from other recycling investments. Gordon testified that he did not directly receive a sales commission with respect to the EI investment in Clearwater. The record with respect to the payment of commissions on this investment is inconclusive. See supra note 5. In evaluating the Clearwater transaction Gordon relied on the offering materials and on discussions with persons involved in the transaction. Efron does not suggest that Swartz or the bankers had any peculiar or specialized knowledge of the Clearwater transaction beyond that of any accountant or banker who had read the prospectus. Petitioner first became aware of EI through Efron. Petitioner contends that he relied heavily on Efron in making his investment in EI and in claiming the associated tax deductions and credits and that he should be relieved of the negligence-related *251 additions to tax under section 6653(a) because of his reliance on Efron. During 1981 petitioner spoke to Efron concerning the original EI offering, decided to invest in EI, and executed the necessary forms. Thereafter, in December of 1981, EI's investments were changed. Petitioner testified that he did not learn about the change in EI's investments until March of 1982, prior to filing his 1981 Federal income tax return. Upon learning of the change in EI's investments, especially the investment in Clearwater, petitioner was concerned and contacted Efron. Petitioner testified that at that time Efron advised him that recycling in general made economical sense and that EI was still a good long-term investment. The record is devoid of any further details concerning the advice petitioner received from Efron after EI's investments were changed to include participation in the Clearwater transaction. Petitioner was aware that Efron was receiving substantial compensation and fees as the general partner of EI and as a 50-percent owner of MFA. This information was disclosed in the offering memorandum and the revised offering memorandum, which petitioner read. In addition, both the original *252 offering memorandum and the revised offering memorandum specifically warned potential investors that they were "not to consider the contents of [the offering memorandum] or any communication from the partnership or its general partners as legal or tax advice", and Efron testified that he advised every limited partner in EI to talk to an independent adviser. Petitioners will not be relieved of negligence on the basis of their purported reliance on Efron. Petitioner also contends that he relied on Cassaday in investing in EI and in claiming the disallowed deductions and credits. During 1981, Cassaday was an officer at the First Bank of Whiting. Petitioner met Cassaday through Efron. Petitioner testified that he informed Efron that he did not have any funds available to invest in EI, and Efron indicated that Cassaday would loan the necessary funds to petitioner. In fact, Cassaday arranged for the First Bank of Whiting to lend petitioner the entire amount of his investment in EI. The loan was unsecured; principal payments were deferred until EI's investments were sold; and interest payments were to be made from tax refunds and any other cash flow generated from petitioner's investment *253 in EI. Petitioner reviewed the original offering memorandum with Cassaday and received the loan from the First Bank of Whiting prior to inclusion of Clearwater in EI's investment objectives. After the introduction of Clearwater into EI's investments, Cassaday did not change petitioner's loan arrangement. The record contains no evidence that petitioner spoke with Cassaday at all after the change in EI's investments. Petitioner's testimony was general and vague, providing no details of his inquiry of Cassaday or the advice he received from Cassaday, if any, following the change in EI's use of funds to include the investment in Clearwater. Petitioner does not seriously contend that Cassaday possessed the requisite expertise in recycling or the plastics industry to enable him properly to evaluate the merits of the Clearwater transaction. Petitioner's purported reliance on Cassaday was not reasonable. In our view, petitioner's purported reliance on Efron and Cassaday was not reasonable, in good faith, and based on full disclosure. Accordingly, we hold that petitioners are not entitled to relief from the negligence-related additions to tax under section 6653(a) because of their *254 alleged reliance on professional advice. Petitioners' reliance on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, is misplaced. The facts in the Heasley case are distinctly different from the facts of this case. In the Heasley case the taxpayers were not educated beyond high school and had limited investment experience, while in the instant case petitioner was a financially successful, sophisticated, highly educated, experienced engineer and senior executive who had made numerous and varied investments. The taxpayers in the Heasley case actively monitored their investment and, as the Fifth Circuit Court of Appeals stated, intended to profit from the investment. We cannot reach similar conclusions in the instant case. Although petitioner testified that he intended to profit from EI's investment in Clearwater, he has failed to provide evidence of any effort to monitor the investment or reliable evidence of any profit objective independent of tax savings. We consider petitioners' arguments with respect to the Heasley case inapplicable. Petitioner entered into the EI investment *255 with limited knowledge and little background with respect to plastics or recycling and without seeking the advice of anyone who had such knowledge. Petitioner did not examine any Sentinel EPE recyclers prior to investing in EI, and he did not seek the advice of an independent third party concerning the machines' values. Petitioner had education and experience in science and technology. The expert reports and testimony of Grossman and Lindstrom demonstrate that information concerning recycling and particularly concerning the pricing of recycling machinery was readily available to a person of petitioner's education and stature in the business community. Petitioner made no effort to obtain such information. He claims he barely looked through the revised offering memorandum. Petitioner's actions were not those of a prudent man with a technical education and extensive business and engineering experience seeking to review a business transaction before investing. Through his investment in EI, petitioner paid less than $ 11,500 to Clearwater and claimed a tax deduction of $ 8,944 and tax credits in the amount of $ 19,302 for the first year of the investment alone. Under the circumstances *256 of this case, petitioner should have known better than to claim the large deductions and tax credits with respect to Clearwater on petitioners' 1981 Federal income tax return. We conclude that petitioners were negligent in claiming the deductions and credits with respect to EI's investment in Clearwater on their 1981 Federal income tax return. We hold, upon consideration of the entire record, that petitioners are liable for the negligence-related additions to tax under the provisions of section 6653(a)(1) and (2) for 1981. Respondent is sustained on this issue. Issue 4. Sec. 6659 Valuation Overstatement
In the notice of deficiency, respondent determined that petitioners were liable for an addition to tax in the amount of $ 7,436 for valuation overstatement under section 6659 on the underpayment of their 1981 Federal income tax. In her opening brief, respondent asserted that petitioners were liable for an addition to tax in the amount of $ 5,791 under section 6659 on the underpayment of their 1981 Federal income tax attributable to the investment tax credit and business energy credit claimed with respect to EI and Clearwater. As noted earlier in this opinion, the amount *257 in dispute in this case is the amount asserted in respondent's opening brief. Petitioners have the burden of proving that respondent's determination of an addition to tax is erroneous. Rule 142(a); Rybak v. Commissioner, 91 T.C. 524, 566 (1988). The underlying facts of this case with respect to this issue are substantially the same as those in Fine v. Commissioner, T.C. Memo. 1995-222. In addition, petitioners' arguments with respect to this issue are essentially identical to the arguments made in the Fine case. For reasons set forth in the Fine opinion, we hold that petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed credits for 1981. Issue 5: Sec. 6621(c) Tax-Motivated Transactions
In the notice of deficiency, respondent determined that interest on deficiencies accruing after December 31, 1984, would be calculated under section 6621(c). The annual rate of interest under section 6621(c) equals 120 percent of the interest payable under section 6601 with respect to any substantial underpayment attributable to *258 tax-motivated transactions. An underpayment is substantial if it exceeds $ 1,000. Sec. 6621(c)(2). The underlying facts of this case with respect to this issue are substantially the same as those in Fine v. Commissioner, supra. In addition, petitioners' arguments on brief with respect to this issue are verbatim copies of the arguments in the taxpayers' briefs in the Fine case. For reasons set forth in the Fine opinion, we hold that respondent's determination as to the applicable interest rate for deficiencies attributable to tax-motivated transactions is sustained, and the increased rate of interest applies for the taxable year in issue. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax year at issue, unless otherwise stated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Sec. 6621(c) was repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989 (sec. 7721(d) of the Act). The repeal does not affect the instant cases. The annual rate of interest under sec. 6621(c)↩ for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.
3. In her amended answer, respondent calculated the negligence-related additions to tax based upon a deficiency in petitioners' 1981 Federal income tax in the reduced amount of $ 23,826.↩
4. The parties did not stipulate certain facts concerning the Provizers, facts regarding the expert opinions, and other matters that we consider of minimal significance. Although the parties did not stipulate our findings regarding the expert opinions, they stipulated our ultimate finding of fact concerning the fair market value of the recyclers during 1981.↩
5. The Clearwater offering memorandum states that the partnership will pay sales commissions and fees to offeree representatives in an amount equal to 10 percent of the price paid by the investor represented by such person. The offering memorandum further states that if such fees are not paid "they will either be retained by the general partner as additional compensation if permitted by applicable state law, or applied in reduction of the subscription price." The Efron Investors Schedule K-1 for 1981 shows that EI paid full price, $ 350,000, for its 7 units of Clearwater, so the 10 percent commission was not applied to reduce the subscription price. Gordon specifically stated that in the case of EI he did not directly receive the sales commission. Efron expressed doubt that he individually had been an offeree representative in connection with Clearwater or any other transaction. There are suggestions that the commission might have been paid to MFA or offeree representatives of individual investors, but the record on this subject is inconclusive. As noted earlier, Cassaday was petitioner's offeree representative with respect to the EI investment.↩
6. In the notice of deficiency respondent disallowed all deductions claimed on petitioners' 1981 return with respect to EI. We sustain only respondent's disallowance of the losses and credits claimed with respect to EI's investment in Clearwater.↩
7. Calculated as follows: ↩
EI's Investment in Clearwater
Petitioner's Share of EI
=
$ 11,179
$ 350,000
X
3.194%
EI's Investment in Clearwater
$ 350,000
X
Petitioner's Investment
=
$ 11,290
EI's Total Investment
$ 50,000
$ 1,550,000