JERRY I. AND RANDE M. SHAPIRO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shapiro v. Commissioner
Docket No. 21246-85
United States Tax Court
T.C. Memo 1995-224; 1995 Tax Ct. Memo LEXIS 222; 69 T.C.M. (CCH) 2671; May 22, 1995, Filed *222 Decision will be entered under Rule 155. For petitioners: Lois C. Blaesing and Chauncey W. Tuttle, Jr.
For respondent: Mary P. Hamilton, Paul Colleran, and William T. Hayes. DAWSON, WOLFE
DAWSON; WOLFE
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: This case is part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion *223 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transaction in this case are substantially identical to those in the Provizer case. Through a second tier partnership, Efron Investors, Jerry I. Shapiro (petitioner) invested in the Clearwater Group limited partnership (Clearwater), the same partnership considered in the Provizer case. Pursuant to petitioners' request at trial, this Court took judicial notice of our opinion in the Provizer case. In a notice of deficiency, respondent determined deficiencies in petitioners' joint 1978 and 1981 Federal income taxes in the amounts of $ 2,196 and $ 9,291.35, respectively, and determined that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). [2] The deficiency for taxable year 1978 results from disallowance of investment tax credit carrybacks and business energy credit carrybacks from taxable year 1981. In addition to the above deficiencies and additions to tax, in an amended answer, respondent asserted the following additions to petitioners' Federal income taxes: Additions to Tax Under
Year
Sec. 6653(a)
Sec. 6659
1978
$ 110
$ 659
1981
[1]
2,234
*224 The issues for decision are: (1) Whether expert reports and testimony offered by respondent are admissible into evidence; (2) whether petitioners are entitled to claimed deductions and tax credits with respect to Clearwater as passed through Efron Investors to petitioner Jerry I. Shapiro; (3) *225 whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a) for 1978 and under section 6653(a)(1) and (2) for 1981; (4) whether petitioners are liable for the additions to tax under section 6659 for underpayments of tax attributable to valuation overstatement; and (5) whether petitioners are liable for increased interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference. Petitioners resided in Munster, Indiana, when their petition was filed. During the years in issue, petitioner was a practicing attorney. In 1981 he was an attorney at the local prosecutor's office and an associate of the law firm Efron and Efron, P.C. Petitioner began working for Efron and Efron, P.C. in 1979. In 1978 and 1981, petitioner Rande M. Shapiro was a bookkeeper. Petitioner is a limited partner in Efron Investors (EI), which is a limited partner in the Clearwater limited partnership. The Clearwater limited partnership is the same recycling partnership that we considered in Provizer v. Commissioner, supra. *226 The underlying deficiency in this case resulted from respondent's disallowance of claimed losses and tax credits that were passed through both Clearwater and EI to petitioner. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, supra.[3] Those facts may be summarized as follows. In 1981, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel expanded polyethylene (EPE) recyclers to ECI Corp. for $ 5,886,000 ($ 981,000 each). ECI Corp., in turn, resold the recyclers to F & G Corp. for $ 6,976,000 ($ 1,162,666 each). F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. We refer to these transactions collectively as the Clearwater transaction. The fair market value of a Sentinel EPE recycler in 1981 was not in excess of $ 50,000. *227 PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC based on the quality and amount of recycled scrap. In 1981, petitioner acquired a 1.596-percent limited partnership interest in EI, and EI acquired a 43.313-percent limited partnership interest in Clearwater. As a result of passthrough from Clearwater and EI, on their 1981 Federal income tax return petitioners deducted an operating loss in the amount of $ 4,469 and claimed investment tax and business energy credits totaling $ 9,644. Petitioners used $ 7,448 [4] of those credits on their 1981 Federal income tax return and carried back the unused portion of the business energy credit, $ 2,196, to 1978. [5] Respondent disallowed petitioners' claimed deductions and credits related to EI's investment in Clearwater for taxable years 1978 and 1981. *228 EI is an Indiana Limited Partnership that was formed in May of 1981 by Morton L. Efron (Efron) as the general partner and Real Estate Financial Corp. (REFC) as the initial limited partner. Fred Gordon (Gordon) is the president of REFC which is owned by members of Gordon's family. EI was formed to acquire limited partnership interests in an office building in Buffalo, New York (the office building), and a shopping center in Haslett, Michigan (the shopping center). In contemplation of these ventures, EI prepared a private placement memorandum (the original offering memorandum) and distributed it to potential limited partners. At some time in late 1981, EI abandoned the contemplated investment in the shopping center and substituted limited partnership interests in Clearwater and a K-Mart shopping center in Swansea, Massachusetts (the K-Mart investment). The revised investment objectives were presented in a revised offering memorandum (the revised offering memorandum). The revised offering memorandum indicated that EI intended to invest in 100 percent of the limited partnership interests in the office building (10 units), 43.75 percent of the limited partnership interests in Clearwater *229 (7 units), and 15.625 percent of the limited partnership interests in the K-Mart investment (2 1/2 units). Potential EI limited partners were informed of the change in EI's investment objectives through informal conversations and the revised offering memorandum. Petitioner became aware of the change in EI's investment objectives shortly after the change occurred. MFA Corp. (MFA) is the ministerial agent for EI. Efron owns 50 percent of the stock of MFA and REFC owns the remaining 50 percent. The revised offering memorandum provides that Efron, as general partner of EI, and MFA, as the ministerial agent for EI, will receive substantial fees, compensation, and profits from EI. The contemplated payments to MFA include: (1) $ 100,000 for supervisory management of the office building and ministerial fees; (2) $ 100,000-$ 125,000 as loan commitment fees; (3) $ 25,000 for note collection guarantees; and (4) a maximum of $ 100,750 in investment advisory fees. In addition, MFA was also the ministerial agent for the office building limited partnership and, according to the revised offering memorandum, received substantial payments in that capacity. Efron obtained financing for the EI *230 investments through local banks. Some of the limited partners in EI made a cash downpayment to EI and then signed installment promissory notes for the remainder of the purchase price. Thereafter, Efron pledged any promissory notes received from limited partners as security for loans to EI. In addition to lending funds directly to EI, the banks also offered loans to individual limited partners for the downpayments needed with respect to the EI investments. Petitioner subscribed to purchase 1/4 of a limited partnership unit ($ 25,000) in EI. He acquired his interest in EI in exchange for a cash payment in the amount of $ 10,081.25 and a promissory note bearing interest at the rate of 11 percent per year with payments due in the amounts of $ 10,451.25 and $ 4,467.50 on January 15, 1982, and January 15, 1983, respectively. Petitioner borrowed from the First Bank of Whiting approximately $ 13,000 of the funds he required to finance acquisition of his interest in EI. The note was secured solely by the EI investment. Petitioner completed arrangements for his loan with Donald Cassaday (Cassaday), a vice president of the First Bank of Whiting. Cassaday was involved with arranging *231 the financing for EI with Efron and arranged required financing for some of the EI limited partners. As a result of petitioners' claimed investment tax credits and business energy credits with respect to EI's interest in Clearwater, petitioners claimed Federal tax refunds for 1978 and 1981 in the amounts of $ 2,196.25 and $ 6,528.37, [6] respectively. In 1981, petitioner learned of EI and the Clearwater transaction from Efron. Efron was a principal member of the law firm that employed petitioner and also was the general partner of EI. Efron organized the EI deal at the law office. In addition to being the general partner, Efron owned limited partnership interests in EI through Efron and Efron Real Estate, a partnership owned by Efron and his wife, and AMBI Real Estate, a partnership owned by Efron and his sister. *232 EI was the first partnership for which Efron served as a general partner. Efron organized EI so that he could earn legal fees and fees for managing the partnership. He received compensation and fees as the general partner of EI and as a 50-percent shareholder of MFA. After EI abandoned the investment in the shopping center, Efron learned of the Clearwater transaction from Gordon. In 1981 Gordon was counsel to EI, to Efron as the general partner of EI, to Efron personally, and to MFA. He and Efron have known each other since meeting at the University of Michigan in 1955. In the early 1960's Efron and Gordon began investing together in the stock market, real estate, business loans, and other investments. Gordon is an attorney who holds a master's degree in business administration and at one time was employed by the Internal Revenue Service. Prior to the date of the Clearwater private placement offering, Gordon had experience involving the evaluation of tax shelters. Gordon recommended investing in the Clearwater offering to the investors in EI, as well as to some of Gordon's other clients. Gordon was paid a fee in the amount of 10 percent of some investments he guided to *233 Clearwater; however he did not receive directly a fee from Clearwater for the EI investments. Efron was aware that Gordon received commissions from the sale of some units in recycling ventures. [7]
*234 Petitioner graduated from high school in the United States, holds an undergraduate degree in history and political science and a law degree, and has been a practicing attorney since 1976. In 1979, he began to work as an associate for Efron and Efron, P.C., doing miscellaneous civil work, including some corporate work. Petitioner Rande M. Shapiro graduated from high school and attended college for 3 years in pursuit of a degree in speech therapy. During 1978 and 1981, she was a bookkeeper. Petitioners do not have any formal training in investments. Petitioners do not have any education or work experience in plastics recycling or plastics materials. Petitioners did not independently investigate the Sentinel recyclers. Petitioner did not see a Sentinel recycler or any other type of plastic recycler prior to participating in the recycling ventures. OPINION In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case involving the Clearwater transaction and another tier partnership, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $ 50,000, (2) held that the Clearwater transaction was a sham because *235 it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers. Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that petitioner's investment in the Sentinel EPE recyclers was similar to the investment described in Provizer v. Commissioner, supra, and, pursuant to their request, we have taken judicial notice of our opinion in the Provizer case. Petitioner invested in EI, a tier partnership that invested in Clearwater. The underlying transaction in this case (the Clearwater transaction), and the Sentinel EPE recyclers considered in this case, are the same transaction and machines *236 considered in Provizer v. Commissioner, supra.
Issue 1: Admissibility of Expert Reports and Testimony
Before addressing the substantive issues in this case, we resolve an evidentiary issue. At trial, respondent offered in evidence the expert opinions and testimony of Steven Grossman (Grossman) and Richard Lindstrom (Lindstrom). At trial and in their reply brief, petitioners object to the admissibility of the testimony and reports. The expert reports and testimony of Grossman and Lindstrom are identical to the testimony and reports in Fine v. Commissioner, T.C. Memo. 1995-222. In addition, petitioners' arguments with respect to the admissibility of the expert testimony and reports are identical to the arguments made in the Fine case. For discussions of the reports see Fine v. Commissioner, supra, and Provizer v. Commissioner, supra. For a discussion of the testimony and petitioners' arguments concerning the admissibility of the testimony and reports see the Fine case. For reasons set forth in Fine v. Commissioner, supra, *237 we hold that the reports and testimony of Grossman and Lindstrom are relevant and admissible and that Grossman and Lindstrom are experts in the fields of plastics, engineering, and technical information. We do not, however, accept Grossman or Lindstrom as experts with respect to the ability of the average person, who has not had extensive education in science and engineering, to conduct technical research, and we have limited our consideration of their reports and testimony to the areas of their expertise. We also hold that Grossman's report meets the requirements of Rule 143(f). Issue 2: Deductions and Tax Credits With Respect to EI and Clearwater
On their joint 1981 Federal income tax return, petitioners claimed the following with respect to petitioner's investment in EI and EI's investment in Clearwater: (1) Deductions in the amount of $ 4,469; (2) an investment tax credit in the amount of $ 4,822; and (3) a business energy credit in the amount of $ 4,822. [8] Respondent disallowed these claimed deductions and tax credits. *238 The underlying transaction in this case is substantially identical in all respects to the transaction in Provizer v. Commissioner, T.C. Memo. 1992-177. The parties have stipulated the facts concerning the deficiency essentially as set forth in our Provizer opinion. Based on this record, we hold that the Clearwater transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Accordingly, respondent is sustained on the issue with respect to the underlying deficiency. Moreover, we note that petitioners have stated their concession of this issue on brief. The record plainly supports respondent's determination regardless of such concession. For a detailed discussion of the facts and the applicable law, see Provizer v. Commissioner, supra.
Issue 3: Sec. 6653(a) Negligence
In her first amendment to answer, respondent asserted that petitioners were liable for the negligence additions to tax under section 6653(a) for 1978 and 1981. Because these additions to tax were raised for the first time in respondent's amendment *239 to answer, respondent bears the burden of proof on this issue. Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994). Section 6653(a) for taxable year 1978 and section 6653(a)(1) for taxable year 1981 provide for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) for taxable year 1981 provides for an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Petitioner contends that he was reasonable in claiming deductions and credits *240 with respect to EI's investment in Clearwater. To support his contention, petitioner alleges the following: (1) That claiming the deductions and credits with respect to EI's investment in Clearwater was reasonable in light of the "oil crisis" in the United States in 1981; (2) that in claiming the deductions and credits, petitioner specifically relied upon Efron, Cassaday, and Jack Weikman (his accountant); and (3) that petitioner was a so-called unsophisticated investor. Petitioner testified that after he signed the EI limited partnership agreement and the EI subscription agreement, he learned that the nature of the EI investment had changed from a strictly real estate deal to a deal including a recycling investment. [9] Petitioner testified that the change in the nature of the EI offering did not concern him and that he did not even consider withdrawing from EI. *241 When petitioners claimed the disallowed deductions and tax credits, they had little, if any, knowledge of the plastics or recycling industries and no engineering or technical knowledge. Petitioners did not independently investigate the Sentinel EPE recyclers. In fact, petitioner testified that he had "no idea" of the price or value of the recyclers. Although petitioner read the revised offering memorandum and the Clearwater memorandum, at trial he did not remember when he read those memoranda or how thoroughly he read them. At trial petitioner could remember almost nothing about the Clearwater transaction except that there were tax benefits in the deal. He could not recall the parties involved, the name of the machines, the byproduct produced by the machines, or the price of virgin resin. Petitioner was unsure as to how EI's investment in Clearwater was supposed to generate income. Petitioner had failed to review the EI offering memorandum or the Clearwater memorandum prior to testifying. He had failed to refresh his memory about the transaction. He was able to remember conclusions favorable to his position in this case and little else. Because of these circumstances, we *242 have not relied heavily on petitioner's testimony and have drawn some adverse conclusions from his persistent lapses of memory. We do not consider petitioner a reliable witness with respect to his reasons for entering into the Efron Investors-Clearwater transaction. The Clearwater offering memorandum clearly stated that the Clearwater transaction involved significant tax risks and that in all likelihood the Internal Revenue Service would challenge the transaction. A careful consideration of the materials in the Clearwater offering memorandum, especially the discussions in the prospectus of high writeoffs and risk of audit, would have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits. See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217. Despite the warnings in the Clearwater offering memorandum, petitioner contends that he was reasonable in claiming the deductions and credits related to EI's investment in Clearwater because of a supposed oil crisis in the United States during 1981. Petitioner argues, *243 in general terms, that based on his experience of living in Israel and the media coverage of the so-called oil crisis, he believed that an investment in recycling had good economic potential. Yet, petitioner was unaware of precisely how Clearwater was supposed to generate income. We find petitioner's vague, general claims concerning the so-called oil crisis to be without merit. Petitioner also argues, in general terms, that due to rising oil prices in 1981, the Federal Government offered incentives to conserve energy, including tax credits, and therefore, he was reasonable in claiming large credits and deductions with respect to EI's investment in Clearwater. As applied to the facts of this case, the argument is unpersuasive. Certainly, the Government was not providing tax benefits for supposed investments that actually were shams and lacked economic substance. See Greene v. Commissioner, 88 T.C. 376 (1987). Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the *244 Krause case are distinctly different from the facts of this case. In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion notes that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in the Krause case were not liable for the negligence-related additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in EOR technology." Id. at 177. In the present case, however, one of respondent's experts, Grossman, noted that the price of plastics materials is not directly proportional to the price of oil, that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase *245 in the cost of plastic products." While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and early 1980's, there is no showing in this record that the supposed energy crisis would provide a reasonable basis for petitioner's investing in recycling of polyethylene. Moreover, the taxpayers in the Krause opinion were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. In the present case, petitioners were not experienced or educated in plastics recycling or plastics materials. They did not independently investigate the Sentinel recyclers, and they did not hire an expert in plastics to evaluate the Clearwater transaction. We consider petitioners' arguments with respect to the Krause case inapplicable. *246 On their 1981 Federal income tax alone, petitioners claimed investment tax and business energy credits related to Clearwater totaling $ 9,644, while petitioner's investment in Clearwater through EI was less than $ 6,000. [10] Therefore, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners never had any money in the [Clearwater] deal." A reasonably prudent person would not conclude without substantial investigation that the Government was providing massive tax benefits to taxpayers who took no risk and made no investment of their own capital. A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good to be true. McCrary v. Commissioner, 92 T.C. 827, 850 (1989). *247 In fact, petitioner argues that he consulted qualified advisers and relied upon them in claiming the disallowed losses and tax credits. Petitioner argues that his reliance on the advice of Efron (his employer), Cassaday (a bank loan officer), and Jack Weikman (his accountant) insulates him from the negligence-related additions to tax. Under some circumstances a taxpayer may avoid liability for the additions to tax for negligence under section 6653(a) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Such circumstances are not present in this case. Moreover, reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); *248 Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974). We have rejected pleas of reliance when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983); Steerman v. Commissioner, T.C. Memo. 1993-447. The record does not show that any of the persons upon whom petitioner allegedly relied possessed any special qualifications or professional skills in the recycling or plastics industries. In addition, none of the persons allegedly relied upon by petitioner hired anyone with plastics or recycling expertise to evaluate the Clearwater transaction. In evaluating the Clearwater transaction, Efron contends that he relied upon (1) the offering materials, (2) Barry Swartz, an accountant, (3) various bankers who loaned *249 funds to EI, and (4) Gordon for his expertise in taxation, finance, and investments. Although Efron testified that when making investments he knows "enough to go get an expert or somebody that knows something", Efron did not consult any plastics engineering or technical experts with respect to EI's investment in Clearwater. Efron relied heavily upon Gordon in deciding to include Clearwater as a part of the revised EI offering. Efron was aware that Gordon was an offeree representative, and received commissions as such, from other recycling investments. Gordon testified that he did not directly receive a sales commission with respect to the EI investment in Clearwater. The record with respect to the payment of commissions on this investment is inconclusive. See supra note 7. In evaluating the Clearwater transaction Gordon relied on the offering materials and on discussions with persons involved in the transaction. Efron does not suggest that Swartz or the bankers had any peculiar or specialized knowledge of the Clearwater deal beyond that of any accountant or banker who had read the prospectus. Petitioner first became aware of the Clearwater investments through EI and Efron. *250 Petitioner contends that he relied heavily on Efron in making his investment in EI and in claiming the associated tax deductions and credits and that he should be relieved of the negligence-related additions to tax under section 6653(a) because of his reliance on Efron. During 1981, petitioner was an associate attorney for Efron and Efron, P.C. While working for Efron, petitioner became aware of Efron's success in personal investments. Petitioner testified that Efron became wealthy by making leveraged investments, that petitioner wanted to "get in on an opportunity to get some income and at the same time get some tax deductions," and that, after the change in EI's investments, Efron told him that EI was an even better deal since it included the Clearwater investment. Efron testified that he advised every limited partner in EI to talk to an independent adviser. The record is devoid of any further details concerning the advice petitioner received from Efron. Petitioner was aware that Efron was receiving substantial compensation and fees as the general partner of EI and as a 50-percent owner of MFA. Such information is disclosed in the revised offering memorandum, which petitioner *251 read. Petitioners will not be relieved of negligence on the basis of their purported reliance on Efron. Petitioner also contends that he relied on Cassaday in investing in EI and in claiming the disallowed deductions and credits. During 1981, Cassaday was an officer at the First Bank of Whiting. Cassaday arranged for the First Bank of Whiting to lend petitioner approximately $ 13,000 to invest in EI. The loan was secured solely by petitioner's investment in EI. The record does not clearly establish when petitioner approached Cassaday. Petitioner did not recall if he spoke with Cassaday after EI's investment objectives were changed to include an investment in Clearwater. Petitioner testified that Cassaday thought the EI investment was a "great deal". Petitioner provided no further details of his inquiry of Cassaday or the advice he received from Cassaday. Petitioner's purported reliance on Cassaday was not reasonable. Petitioner contends that he also relied on his accountant, Jack Weikman (Weikman). Petitioner's testimony was general and vague, providing no details of the advice he received from Weikman. Petitioner testified that he delivered a copy of the EI offering *252 memorandum [11] to Weikman. In his testimony, petitioner responded affirmatively to his attorney's suggestion that Weikman recommended that petitioner "participate in the investment". Petitioner also volunteered that another of Weikman's clients invested in EI. Petitioner does not seriously contend that Weikman possessed any firsthand knowledge of the Clearwater transaction or the requisite expertise in recycling or the plastics industry to permit an evaluation of the merits of EI or the Clearwater transaction. In fact, the record does not clearly establish whether Weikman even reviewed the revised offering memorandum or the Clearwater offering memorandum. Petitioner's purported reliance on Weikman was not reasonable. In our view, petitioner's purported reliance on Efron, Cassaday, and Weikman was not reasonable, in good *253 faith, and based on full disclosure. Accordingly, we hold that petitioners are not entitled to relief from the negligence-related additions to tax under section 6653(a) because of their alleged reliance on professional advice. Petitioners' reliance on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, is misplaced. The facts in the Heasley case are distinctly different from the facts of this case. In the Heasley case the taxpayers were not educated beyond high school, while in the instant case petitioner was a highly educated attorney who worked in the office of the promoter of the EI investment. The taxpayers in the Heasley case actively monitored their investment and, as the Fifth Circuit Court of Appeals stated, intended to profit from the investment. We cannot reach similar conclusions in the instant case. Although petitioner testified that he intended to profit from EI's investment in Clearwater, he has failed to provide evidence of any effort to monitor the investment or reliable evidence of any profit objective independent of tax savings. We consider petitioners' arguments *254 with respect to the Heasley case inapplicable. Petitioner entered into the EI investment without any knowledge or background with respect to plastics or recycling and without seeking the advice of anyone who had such knowledge. Petitioner did not examine any Sentinel EPE recyclers prior to investing in EI, and he did not seek the advice of an independent third party concerning the machines' values. Through his investment in EI, petitioner paid approximately $ 6,000 to Clearwater and claimed a tax deduction of $ 4,469 and tax credits in the amount of $ 9,644 with respect to that investment for the first year of the investment alone. Under the circumstances of this case, petitioner should have known better than to claim the large deductions and tax credits with respect to Clearwater on petitioners' 1978 and 1981 Federal income tax returns. We conclude that petitioners were negligent in claiming the deductions and credits with respect to EI's investment in Clearwater on their Federal income tax returns for 1978 and 1981. We hold, upon consideration of the entire record, that petitioners are liable for the negligence-related additions to tax under the provisions of section 6653(a) *255 for 1978 and under the provisions of section 6653(a)(1) and (2) for 1981. Respondent is sustained on this issue. Issue 4. Sec. 6659 Valuation Overstatement
In her first amendment to answer, respondent asserted that petitioners were liable for the addition to tax for valuation overstatement under section 6659 on the underpayment of their 1978 and 1981 Federal income taxes attributable to the investment tax credit and business energy credit claimed with respect to EI and Clearwater. [12] Because these additions to tax were raised for the first time in respondent's amendment to answer, respondent bears the burden of proof on this issue. Rule 142(a); Vecchio v. Commissioner, 103 T.C. at 196. The underlying facts of this case with respect to this issue are substantially the same as those in Fine v. Commissioner, T.C. Memo. 1995-222. In addition, petitioners' *256 arguments with respect to this issue are identical to the arguments made in the Fine case. For reasons set forth in the Fine opinion, we hold that petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed credits for 1978 and 1981. [13]
Issue 5: Sec. 6621(c) Tax-Motivated Transactions
In the notice of deficiency, respondent determined that interest on deficiencies accruing after December 31, 1984, would be calculated under section 6621(c). The annual rate of interest under section 6621(c) equals 120 percent of the *257 interest payable under section 6601 with respect to any substantial underpayment attributable to tax-motivated transactions. An underpayment is substantial if it exceeds $ 1,000. Sec. 6621(c)(2). The underlying facts of this case with respect to this issue are substantially the same as those in Fine v. Commissioner, supra. In addition, petitioners' arguments on brief with respect to this issue are verbatim copies of the arguments in the taxpayers' briefs in the Fine case. For reasons set forth in the Fine opinion, we hold that respondent's determination as to the applicable interest rate for deficiencies attributable to tax-motivated transactions is sustained, and the increased rate of interest applies for the taxable years in issue. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax years in issue, unless otherwise stated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The notice of deficiency refers to sec. 6621(d). This section was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744 and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989 (sec. 7721(d) of the Act). The repeal does not affect the instant cases. For simplicity, we shall refer to this section as sec. 6621(c). The annual rate of interest under sec. 6621(c)↩ for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.
1. Respondent asserts that petitioners are liable for the addition to tax under sec. 6653(a)(1) in the amount of $ 465 and the addition to tax under sec. 6653(a)(2)↩ in an amount equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.
3. The parties did not stipulate certain facts concerning the Provizers, facts regarding the expert opinions, and other matters that we consider of minimal significance. Although the parties did not stipulate our findings regarding the expert opinions, they stipulated our ultimate finding of fact concerning the fair market value of the recyclers during 1981.↩
4. $ 329 of the credits claimed on petitioner's 1981 return are from other investments.↩
5. Petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, claiming a refund for 1978 as a result of the carryback.↩
6. The claimed refund resulted from petitioners' claimed investment tax credits and business energy credits related to Clearwater in the aggregate amount of $ 7,448 on their 1981 Federal income tax return.↩
7. The Clearwater offering memorandum states that the partnership will pay sales commissions and fees to offeree representatives in an amount equal to 10 percent of the price paid by the investor represented by such person. The offering memorandum further states that if such fees are not paid "they will either be retained by the general partner as additional compensation if permitted by applicable state law, or applied in reduction of the subscription price." The Efron Investors Schedule K-1 for 1981 shows that EI paid full price, $ 350,000, for its 7 units of Clearwater, so the 10 percent commission was not applied to reduce the subscription price. Gordon specifically stated that in the case of EI he did not directly receive the sales commission. Efron expressed doubt that he individually had been an offeree representative in connection with Clearwater or any other transaction. There are suggestions that the commission might have been paid to MFA and that individual investors consulted offeree representatives, but the record on this subject is inconclusive.↩
8. Petitioners did not utilize all of their claimed investment tax and business energy credits on their 1981 Federal income tax return. They claimed credits equal to the tax stated on their return and carried the remaining credits back to taxable year 1978.↩
9. Petitioner signed the EI subscription agreement and limited partnership agreement on Dec. 17, 1981. The revised offering memorandum for EI is dated Dec. 14, 1981. Although petitioner testified that he learned of the change in EI's investment objectives in 1981, the record is unclear as to precisely when petitioner received a copy of the revised offering memorandum.↩
10. Calculated as follows: ↩
EI's Investment in Clearwater
Petitioner's Share of EI
=
$ 5,586
$ 350,000
x
1.596%
EI's Investment in Clearwater
$ 350,000 /
x
Petitioner's Investment
=
$ 5,645
EI's Total Investment
$ 25,000
$ 1,550,000
11. Petitioner's testimony is vague. The record is unclear as to whether Weikman received a copy of the original offering memorandum, a copy of the revised offering memorandum, or copies of both.↩
12. Respondent calculated the sec. 6659 addition to tax based only on the credits claimed.↩
13. Sec. 6659 applies to returns filed after Dec. 31, 1981. Although petitioners filed a return for 1978 prior to Dec. 31, 1981, they are liable for the additions to tax under sec. 6659 for 1978 because the underpayment of tax for that year is attributable to the carryback of unused tax credits claimed on their return for 1981. Nielsen v. Commissioner, 87 T.C. 779↩ (1986).