T.C. Memo. 1996-230


UNITED STATES TAX COURT


JEFFREY I. AND ROBERTA H. STONE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JOSEPH AND MARY COTE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11776-88, 322-91.          Filed May 22, 1996


<u>Bernard S. Mark</u> and <u>Richard S. Kestenbaum</u>, for petitioners.

<u>Lawrence L. Davidow</u> and <u>Frances Ferrito Regan</u>, for
respondent in docket No. 11776-88.

<u>Barry J. Laterman</u>, for respondent in docket No. 322-91.


MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  These cases were assigned to Special Trial
Judge Norman H. Wolfe pursuant to the provisions of section

7443A(b)(4) and Rules 180, 181, and 183.[1]  They were tried and briefed separately but consolidated for purposes of opinion.  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  These cases are part of the Plastics Recycling group of cases.  For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The underlying transactions in these cases are substantially identical to the transaction considered in the Provizer case.

In a notice of deficiency, respondent determined a deficiency in the 1981 joint Federal income taxes of petitioners Stone in the amount of $52,576 and additions to tax for that year in the amount of $15,773 under section 6659 for valuation overstatement, in the amount of $2,629 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in an amount equal to 50 percent of the interest due on the underpayment attributable to negligence.  In another notice of deficiency, respondent determined deficiencies in the 1980 and 1981 joint Federal income taxes of petitioners Cote in the respective

---

[1]    All section references are to the Internal Revenue Code in effect for the years in issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

amounts of $16,941 and $100,472.[2]  For those same years,

respondent determined the following additions to tax.

| | Additions to Tax | | | |
|---|---|---|---|---|
| Year | Sec. 6651 | Sec. 6653(a)(1)1 | Sec. 6653(a)(2) | Sec. 6659 |
| 1980 | | $847 | | |
| 1981 | $3,619 | 5,024 | 2 | $30,141 |

1 For 1980, the addition to tax is under sec. 6653(a).

2 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.

Respondent also determined in each case that interest on

deficiencies accruing after December 31, 1984, would be

calculated at 120 percent of the statutory rate under section

6621(c).

Stipulations of Settled Issues pertaining to petitioners'

respective participation in the Plastics Recycling Program, and

filed in each of these consolidated cases, provide in part that:

1.  Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.

2.  The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly §6621(d).

3.  This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting

2      The deficiency in the Cote case for taxable year 1980 is solely attributable to respondent's disallowance of an investment credit carryback from taxable year 1981.

from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of §6653(a).

Respondent's determination of an addition to tax under section 6651 with respect to petitioners Cote was not specifically addressed in the stipulation of settled issues nor elsewhere in the record. However, given the third stipulation in the stipulation of settled issues, we consider any issue with respect to the addition to tax under section 6651 to be settled. See also Rule 142(a).

Accordingly, the only issues remaining in these consolidated cases are: (1) Whether petitioners are liable for additions to tax under section 6653(a)(1) and section 6653(a)(2) for negligence; and (2) whether petitioners are liable for additions to tax under section 6659 for underpayments of tax attributable to valuation overstatements.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference. Petitioners Stone resided in Framingham, Massachusetts, when their petition was filed. Petitioners Cote resided in Huntington, New York, when their petition was filed.

During 1981, petitioner Jeffrey Stone (Stone) was the sole owner of an electronics distributor, Stone Component Sales Corp., for which he worked as a manufacturers' representative. His

spouse, Roberta, was not employed outside the home.  On their 1981 Federal income tax return, petitioners Stone reported gross income from wages, interest, and dividends in excess of $250,000. Consequently, in the absence of significant deductions or credits, they were subject to payment of Federal income taxes in substantial amounts for taxable year 1981.

Petitioner Joseph Cote (Cote) was a corporate bond trader for Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), during 1981.  His wife, Mary, was not employed outside the home. On their 1981 Federal income tax return, petitioners Cote reported gross income from wages, interest, and dividends in excess of $320,000.  Consequently, in the absence of significant deductions or credits, they were subject to payment of Federal income taxes in substantial amounts for taxable year 1981.

Stone is a limited partner in Northeast Resource Recovery Associates (Northeast) and Cote is a limited partner in Hyannis Recycling Associates (Hyannis).  For convenience, we refer to these two partnerships collectively as the Partnerships.

Petitioners have stipulated that the transactions involving the Sentinel EPE recyclers leased by the Partnerships are substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, T.C. Memo. 1992-177.  In addition, petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each. F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, each of the Partnerships herein was formed to lease Sentinel EPE recyclers from F & G Corp. and license those recyclers to FMEC Corp.[3] The transactions of the Partnerships differ from the underlying transaction in the Provizer case in the following respects: (1) The entity that leased the machines from F & G Corp. and licensed them to FMEC Corp.; (2) in the Northeast transaction, seven, rather than six, machines were sold, leased, licensed, and sublicensed; and (3) in the Hyannis transaction, F & G purchased the recyclers for $1,066,667 each.[4] For convenience we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions. In addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers

---

[3] As the Hyannis transaction was initially structured, Hyannis purchased the recyclers from ECI Corp. and leased them to FMEC. This transaction was restructured to take advantage of the safe-harbor leasing rules of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 172. As in all subsequent Plastics Recycling programs, F & G Corp. was interposed between ECI and the primary leasing partnership (in this case Hyannis).

[4] There is no explanation in the record as to why the six recyclers were sold to F & G Corp. for $6,400,000 in the Hyannis transaction but later sold for $6,975,996 in subsequent Plastics Recycling transactions. We note that the Hyannis partnership initially closed at the lower price prior to the enactment of the safe-harbor legislation, and subsequently the arrangement was modified in an attempt to take advantage of those rules by inserting F & G Corp. into the transaction.

and Sentinel expanded polystyrene recyclers.  We refer to these collectively as the Plastics Recycling transactions.

With respect to each of the Partnerships, a private placement memorandum was distributed to potential limited partners.  Appended to the offering memoranda were reports by F & G's evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor.  The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships.  Specifically, the offering memoranda state:  (1) That there is a substantial likelihood of audit by the Internal Revenue Service (IRS) and that the purchase price paid to ECI Corp. probably would be challenged as being in excess of fair market value; (2) that the Partnerships have no prior operating history; (3) that the general partners have no prior experience in marketing recycling or similar equipment; (4) that the limited partners have no control over the conduct of the Partnerships' business; (5) that there is no established market for the Sentinel EPE recyclers; (6) that there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) that certain potential conflicts of interest exist.

During 1981, Stone acquired a 2.60525-percent interest in Northeast for his investment of $25,000.  As a result of the

passthrough from Northeast, on their 1981 Federal income tax return the Stones deducted an operating loss in the amount of $20,340 and claimed investment tax and business energy credits totaling $42,406. The underlying deficiency in the Stone case results from respondent's disallowance of the Stones' claimed operating losses and credits related to Northeast.

Also during 1981, Cote acquired a 6.187-percent interest in Hyannis for his investment of $50,000.[5] As a result of the passthrough from Hyannis, on their 1981 Federal income tax return the Cotes deducted an operating loss in the amount of $40,646 and claimed investment tax and business energy credits totaling $74,611. An additional $4,583 of the 1981 business energy credit was carried back to 1980. The Cotes' underlying deficiencies for taxable years 1980 and 1981 result from respondent's disallowance of their claimed operating losses and credits related to Hyannis.

Cote and Stone are both well educated and very successful and sophisticated businessmen. Stone holds a B.S. in electrical engineering from Northeastern University and an M.B.A. from Babson College. After college he worked for the Raytheon and Hewlett-Packard companies, and in 1975 he started his own electronic components company, Stone Component Sales Corp. Cote

---

[5]   The parties stipulated that Cote owned a 3.094-percent interest in Hyannis. However, Cote's 1981 Form K-1, Partner's Share of Income, Credits, Deductions, etc., attached to the Hyannis partnership return, indicates that he acquired a 6.187-percent interest in Hyannis. The reason for this discrepancy is not explained in the record.

graduated from high school in 1959, married and had a family, and drove a taxi until he got a job as a conductor on the Long Island railroad in 1964. In 1969 he began working for Merrill Lynch as an order clerk, and he worked for both the railroad and Merrill Lynch until he made a living in the securities business. After becoming a senior trader at Merrill Lynch, Cote left for Loeb, Rhodes in 1972 and eventually ran their trading desk. In 1978 he returned to Merrill Lynch and co-managed their high yield securities department. From 1978 to 1988 Cote also served as one of five voting members of the Merrill Lynch High Yield Commitment Committee. During the time he served as a member, the committee made decisions for the underwriting of more than $12 billion in securities.

Stone learned about the Sentinel EPE recyclers and Northeast from Donald F. Tomasetti (Tomasetti), an accountant married to a cousin of his. The two have known each other on a personal level since the 1960's. Tomasetti has a B.B.A. in accounting from the University of Massachusetts. He worked at Peat, Marwick, Mitchell for 13 years (5-1/2 as an auditor and 7-1/2 as a tax specialist). In 1975 he established his own full service accounting practice, Romito & Tomasetti. Two or 3 years later, Stone Component Sales Corp. became a client of Romito & Tomasetti, with Tomasetti acting as the principal adviser to both the corporation and Stone individually. Tomasetti has no expertise in plastics.

Tomasetti learned about the Sentinel EPE recyclers from John Frabotta (Frabotta) and Dick Omohundro (Omohundro).[6]  Together they paid Tomasetti a fee for his services in reviewing the private placement memorandum concerning the Sentinel recyclers and also going to Hyannis to look at the equipment they were considering as an investment.  Frabotta has a B.A. in economics and accounting from San Diego State University and an M.B.A. from Suffolk University.  From 1964 to 1973 he worked in the commercial and investment departments of First National Bank of San Diego, from 1973 to 1978 he and Omohundro managed a Boston mutual fund, for which Tomasetti was the auditor, from 1979 to 1987 he and Cote managed the research and high yield securities group at Merrill Lynch, and since 1988 he has worked for a registered investment adviser, Prospect Street Investment Management, another fund for which Tomasetti is the auditor.  Frabotta is not an expert in plastics or plastics recycling.

Frabotta learned about the Sentinel EPE recyclers from Cote, who in turn had learned about them from an accounting firm, Finkle & Co.  Finkle & Co. performed accounting functions for Northeast or its general partner, Richard Roberts (Roberts), in 1983.[7]  Cote, Omohundro, and Frabotta all worked at Merrill Lynch

---

[6]    Omohundro did not testify at the trial.

[7]    In 1983 Finkle & Co. prepared a report on the polyethylene operations at Hyannis.  Roberts forwarded this report to limited partners in the Plastics Recycling transactions.  In a cover letter, Roberts refers to Finkle & Co. as "our accounting firm".

during the years at issue and they often discussed investment
opportunities with each other. Each reviewed the offering
materials for the Partnership transactions, and Omohundro,
Frabotta, and Tomasetti together visited the PI plant in Hyannis,
Massachusetts. At the PI plant, they saw a Sentinel EPE recycler
in operation and discussed the nature of the business with the
promoters of the partnerships and PI personnel.

During Tomasetti's tour at PI, there was an inquiry about
the cost of the Sentinel EPE recycler but PI representatives
declined to discuss that subject because, as Tomasetti understood
it, the machine was proprietary in nature and had not been
patented. (Although PI claimed that its information was a trade
secret and that it never obtained patents on its machines, in
fact, PI had obtained numerous patents prior to the Partnership
transactions and had also applied for a trademark for the
Sentinel EPE recyclers). PI indicated that there was no other
comparable machine on the market and Tomasetti made no
independent inquiries or investigation regarding the uniqueness
or value of the recycler. Tomasetti read the reports of Ulanoff
and Burstein, but did not fully understand them and did not
attach much weight to them. No other members of Tomasetti's
accounting firm performed any due diligence or investigation of

---

It is not clear whether Finkle & Co. prepared the report for
Northeast or Roberts' consulting firm.

the Partnership transactions.  An attorney representing one of Tomasetti's client's supposedly did speak with some acquaintances at PI.

Tomasetti did not attempt to market the Partnership transactions himself.  He thought they were very aggressive.  He fully expected an IRS challenge "because of the obvious tax benefits in excess of the investment that were being achieved in the first year".  Tomasetti understood that the tax benefits stemmed from the purported value of the Sentinel EPE recyclers, and he did not believe it was prudent to invest in the partnerships while relying upon the value of the recyclers as represented in the offering materials.  Tomasetti believed that before investing, an interested party should have a strong inclination that the Partnership transactions were economically viable.  Tomasetti thought that a substantial value for the recyclers might be established in the future if the machines performed well.

Frabotta understood that Omohundro questioned a few Boston area law firms about PI and was told nothing that gave him concern.  Frabotta did not pursue an independent investigation of the value of the Sentinel EPE recycler, nor did he ask anyone else to investigate it.  Frabotta discussed the value of the recycler with Tomasetti and Omohundro only in passing.  Frabotta did not verify the price of resin; he did not inquire whether

there were other comparable machines on the market; and he did not ask anyone about the market for the Sentinel EPE recycler.

Stone reviewed the Northeast offering memorandum and spoke with Tomasetti about the visit to Hyannis. Stone knew that Tomasetti had no expertise in plastics, and Tomasetti never told Stone that he had consulted with, or intended to consult, anyone who was not associated with PI or the Partnerships. Stone knew that Tomasetti was unsure about the value of the Sentinel EPE recycler, but the value of the machine did not concern Stone. He also knew that Tomasetti received a commission for sales of partnership interests. Stone did not investigate the existence of competing suppliers or manufacturers, or the existence of a market for the recyclers. Except for two or three discussions with Tomasetti, Stone did not independently, or through any third parties, investigate PI or the plastics recycling industry.

Cote spoke with people at Merrill Lynch about leasing transactions in general, recycling, and speculation about the price of oil. He did not supply anyone with the Hyannis offering memorandum or pay for an evaluation of Hyannis, nor did anyone prepare any kind of report for him. Cote and Frabotta understood from a client, Global Marine, Inc., an offshore drilling company, that there was speculation that the price of oil could rise. Cote spoke to a representative of Finkle & Co. about Hyannis' tax benefits. He was aware that Burstein had a potential conflict of interest, that there was no established market for the recyclers,

and that Finkle & Co. received a sales commission on his investment in the Partnerships. Cote also knew that Frabotta and Omohundro were not plastics recycling experts. Cote knew of Tomasetti because he was Omohundro's accountant, but Cote never had any direct conversations with Tomasetti.

None of petitioners have any education or work experience in plastics recycling or plastics materials. They did not independently investigate the Sentinel EPE recyclers or see a Sentinel EPE recycler or any other type of plastics recycler prior to participating in the recycling ventures.

OPINION

We have decided more than two dozen of the Plastics Recycling group of cases.[8] The majority of these cases, like the

---

[8] Provizer v. Commissioner, T.C. Memo. 1992-177, concerned the substance of the partnership transaction and also the additions to tax. The following cases concern additions to tax for negligence, inter alia: Reimann v. Commissioner, T.C. Memo. 1996-84; Bennett v. Commissioner, T.C. Memo. 1996-14; Atkind v. Commissioner, T.C. Memo. 1995-582; Triemstra v. Commissioner, T.C. Memo. 1995-581; Pace v. Commissioner, T.C. Memo. 1995-580; Dworkin v. Commissioner, T.C. Memo. 1995-533; Wilson v Commissioner, T.C. Memo. 1995-525; Avellini v. Commissioner, T.C. Memo. 1995-489; Paulson v. Commissioner, T.C. Memo. 1995-387; Zidanich v. Commissioner, T.C. Memo. 1995-382; Ramesh v. Commissioner, T.C. Memo. 1995-346; Reister v. Commissioner, T.C. Memo. 1995-305; Fralich v. Commissioner, T.C. Memo. 1995-257; Shapiro v. Commissioner, T.C. Memo. 1995-224; Pierce v. Commissioner, T.C. Memo. 1995-223; Fine v. Commissioner, T.C. Memo. 1995-222; Pearlman v. Commissioner, T.C. Memo. 1995-182; Kott v. Commissioner, T.C. Memo. 1995-181; and Eisenberg v. Commissioner, T.C. Memo. 1995-180. Also, Baratelli v. Commissioner, T.C. Memo. 1994-484; Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434; Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645; and Madison Recycling Associates v. Commissioner, T.C. Memo. 1992-605, concern other issues.

consolidated cases herein, raised issues regarding additions to tax for negligence and valuation overstatement. We have found the taxpayers liable for such additions to tax in all but one of the opinions issued to date.[9]

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the transaction, which is almost identical to the Partnership transactions in these consolidated cases, was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to the Clearwater partnership were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

---

[9] In Zidanich v. Commissioner, T.C. Memo. 1995-382, we found the taxpayers liable for the section 6659 addition to tax, but not liable for the negligence additions to tax under section 6653(a). As indicated in our opinion, the Zidanich case, and the Steinberg case consolidated with it for opinion, involved exceptional circumstances.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that the investments in the Sentinel EPE recyclers in these cases are similar to the investment described in Provizer v. Commissioner, supra. The underlying transactions in these consolidated cases, and the Sentinel EPE recyclers considered in these cases, are the same type of transaction and same type of machine considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and petitioners' testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in their respective stipulations of fact and stipulations of settled issues filed shortly before trial. The record plainly supports respondent's determinations in these cases regardless of such concessions. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

Issue 1. Section 6653(a) Negligence

In notices of deficiency, respondent determined that petitioners were liable for additions to tax for negligence under

section 6653(a) for 1980 and 6653(a)(1) and (2) for 1981. Each of petitioners has the burden of proving that respondent's determinations of these additions to tax are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Section 6653(a) for 1980 and section 6653(a)(1) for 1981 impose an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. In cases involving negligence for 1981, an additional amount is added to the tax under section 6653(a)(2); such amount is equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).

Petitioners in these consolidated cases contend that they were reasonable in claiming deductions and credits with respect to the Partnerships. Petitioners each allege that they reasonably relied upon the advice of qualified advisers, and that they reasonably expected an economic profit in light of the so-called oil crisis in the United States during 1981. In each

case, petitioners' investigation of the Partnership transactions and the Sentinel EPE recyclers was essentially limited to conversations with Tomasetti, Frabotta, or Omohundro, in addition to a review of the respective offering memoranda. Petitioners argue that such investigation insulates them from the negligence additions to tax.

Under some circumstances a taxpayer may avoid liability for the additions to tax under section 6653(a) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974).

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v.

Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v.

Commissioner, 92 T.C. 958, 992-993 (1989), affd. without

published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v.

Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91

T.C. 524, 565 (1988).  We have rejected pleas of reliance when

neither the taxpayer nor the advisers purportedly relied upon by

the taxpayer knew anything about the nontax business aspects of

the contemplated venture.  Beck v. Commissioner, 85 T.C. 557

(1985); Flowers v. Commissioner, 80 T.C. 914 (1983); Steerman v.

Commissioner, T.C. Memo. 1993-447.

Based upon our review of the entire records in these cases,

we hold that Stone's purported reliance on Tomasetti, and Cote's

purported reliance on Frabotta and Omohundro, and through them

Tomasetti, was not reasonable, not in good faith, nor based upon

full disclosure.  Neither petitioners, nor their supposed

advisers, nor anyone affiliated with them had any education or

work experience in plastics materials or plastics recycling.

Neither petitioners nor their supposed advisers consulted any

independent experts or conducted anything approaching a

meaningful investigation.  In addition, it is clear that

Tomasetti had serious concerns regarding the recycler's purported

value, and nothing in the records indicates that his concerns

were not communicated to petitioners.

Frabotta's purported investigation entailed speaking to a

client contact at Global Marine about the price of oil, a review

of the offering memorandum, and a visit to Hyannis with Tomasetti and Omohundro.  Tomasetti became involved at the behest of Frabotta and Omohundro; they paid him to review the offering materials and visit PI with them.  Omohundro did not testify at the trial; aside from visiting the PI plant in Hyannis, he purportedly phoned some legal contacts in Boston who knew of no reason to be concerned about PI.  As for Finkle & Co., nothing in the records indicates that they performed any due diligence, and in 1983 they were providing services to either Northeast or Roberts.  See supra note 7.  Consequently, we must consider this accounting firm part of the offering or promoting group.

None of petitioners' supposed advisers had any background in plastics or plastics recycling to help them analyze or assess the recyclers, and the only persons they spoke to were insiders of the Partnerships or PI personnel.  Neither Tomasetti nor Frabotta made any inquiries regarding the value of the machine or sought any independent investigation or third party appraisal.  The PI personnel, insiders, and promoters they spoke to in Hyannis were the ones petitioners ultimately relied upon for the value of the Sentinel EPE recycler and the economic viability of the Partnership transactions.  See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion."

Tomasetti understood that the tax benefits were generated by the purported value of the recyclers and thought that "nobody

should go into this deal at all based on the valuations established." He did not market the Partnerships; in his view the deal "was very aggressive" and "sure to be challenged" by the IRS. He knew that the recyclers were insured for only a "nominal amount" in relation to their purported value. (The parties have stipulated that the recyclers had a manufacturing cost of only $18,000 each.) Consequently, Tomasetti believed their purported value could only be supported by the success of the Partnerships, i.e., as a function of market demand, and that an investor should therefore have "a strong inclination that this was a viable economic deal." Both Tomasetti and Frabotta testified that they believed the purported value of the Sentinel EPE recycler was supported by the economic projections in the offering materials.

Neither Tomasetti nor Frabotta, nor anyone associated with them investigated the merits of those projections. Frabotta did not investigate the market for the Sentinel EPE recycler or inquire as to whether the recycler had any competition. Tomasetti made no independent inquiries or investigation of the recycler or any of the individuals involved. He thought that there was a ready market for the recyclers. As he put it, "I did some due diligence to the extent that I was asked to accompany these individuals to Hyannis, but it wasn't my objective to go down and to try and shake this out, and spend six months of my life trying to learn about the industry".

The offering materials clearly stated that there was no established market for leasing or operating the recyclers. Information published prior to the Plastics Recycling transactions indicated that several machines capable of densifying low density materials already were on the market. Other plastics recycling machines available during 1981 ranged in price from $20,000 to $200,000, including the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177.

Petitioners have failed to show that Tomasetti, Frabotta, Omohundro, or Finkle & Co. was qualified to evaluate the Sentinel EPE recyclers and the Partnership transactions. Tomasetti was skeptical of the recycler's inflated value, and he communicated the results of his investigation and review to his clients. Frabotta's and Tomasetti's testimony that they believed the purported value of the recycler was supported by the economic projections in the offering materials is without merit and not credible. Petitioners knew that Tomasetti and Frabotta had no education or expertise in plastics or plastics recycling, and there is no reason to doubt that Tomasetti's reservations and disclaimers were communicated to petitioners. A taxpayer may rely upon his adviser's expertise (in these cases, accounting, financial planning, and tax advice), but it is not reasonable or prudent to rely upon an adviser regarding matters outside of his

field of expertise or with respect to facts which he does not verify. See Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329, affd. without published opinion 72 F.3d 123 (3d Cir. 1995). Because of the technical nature of these investment ventures, it was unreasonable for petitioners to rely on Tomasetti, Frabotta, or Omohundro.

Moreover, a careful consideration of the materials in the respective offering memoranda, especially the discussions in the prospectuses of high writeoffs and risk of audit, should have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits. See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217. The preface to each memorandum contained the following: NO OFFEREE SHOULD CONSIDER THE CONTENTS OF THIS MEMORANDUM *** AS *** EXPERT ADVICE. *** EACH OFFEREE SHOULD CONSULT HIS OWN PROFESSIONAL ADVISERS AS TO LEGAL, TAX, ACCOUNTING AND OTHER MATTERS RELATING TO ANY PURCHASE BY HIM OF UNITS. Each of the memoranda also clearly stated that the respective Partnership transactions involved significant tax risks and that in all likelihood the IRS would challenge the transactions. In a "business risks" section, each warned that there was no history for the subject partnership, no established market for the recyclers, and that there could be no assurance that recycled pellets would be as marketable as virgin pellets.

It is clear from the records that none of petitioners carefully considered the risk factors mentioned in the offering memoranda.

On their face, the Partnership transactions should have raised serious questions in the minds of ordinarily prudent investors. According to the Northeast and Hyannis offering memoranda, the projected benefits for taxable year 1981 were, for each $50,000 investor, investment tax credits of $84,813 and $79,200, respectively, plus deductions of $40,174 and $42,491, respectively, all in the initial year of investment.[10] In the first year of the investments alone, the Stones and Cotes claimed operating losses in the respective amounts of $20,340 and $40,646, plus investment tax and business energy credits in the respective amounts of $42,406 and $79,194 ($4,583 of which was carried back to 1980). Therefore, like the taxpayers in Provizer v. Commissioner, supra, except for a few weeks at the beginning, none of petitioners ever had any money in the Partnerships. A reasonably prudent person would not conclude without substantial investigation that the Government was providing significant tax benefits to taxpayers who took no business risk and made no investment of their own capital. McCrary v. Commissioner, 92 T.C. 827, 850 (1989).

---

[10]     In both cases the parties stipulated that the offering memoranda projected tax benefits of $86,328 in investment tax credits and $39,399 in deductions. There is no explanation for this discrepancy in the record.

The Stones placed into the record of their case several documents, ostensibly submitted as evidence that they monitored their investments in Northeast. These included unaudited financial statements of Northeast prepared by nonindependent accountants from 1981 to 1985, Forms K-1 from 1984 and 1986, a 1983 report prepared by Finkle & Co. describing the accounting procedures and controls for the recycling operations at PI, and a 1983 update from PI noting that "market prices for polyethylene resin have remained relatively low * * * [and] the Sentinel recyclers * * * have not been profitable." Stone did not testify or otherwise indicate that he ever examined these documents. He spoke to Roberts once about the performance of the Northeast partnership and learned that it was experiencing difficulty placing the machines. We decline to infer from these documents that he actively monitored his investment in Northeast.

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Notwithstanding this concession, petitioners contend that they were reasonable in claiming credits on their Federal income tax returns based upon each recycler's having a value of $1,066,666 in the Hyannis partnership and $1,162,666 in the Northeast partnership.[11] In support of this

---

[11]   The Hyannis partnership involved 6 machines on which the partnership set a value of $6,400,000. The Northeast partnership involved 7 machines on which the partnership set a value of $8,138,667.

position, petitioners submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates. Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners." Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981 and 1982.

We accord no weight to the Carmagnola reports submitted by petitioners. The projected valuations therein were based on inadequate information,[12] research, and investigation, and were subsequently rejected and discredited by their author. Respondent likewise rejected the reports and considered them unsatisfactory for any purpose, and there is no indication in the records that respondent used them as a basis for any

---

[12] In one preliminary report, Carmagnola states that he has "a serious concern of actual profit-level" of a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

determinations in the notices of deficiency. Even so, petitioners' counsel obtained copies of these reports and urge that they support the reasonableness of the values reported on petitioners' returns. Not surprisingly, petitioners did not call Carmagnola to testify in these cases,[13] but preferred instead to rely solely upon his preliminary, ill-founded valuation estimates. The Carmagnola reports were a part of the record considered by this Court and reviewed by the Sixth Circuit Court of Appeals in the Provizer case, where we held the taxpayers negligent. Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence. Petitioners are not relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Petitioners' reliance on Mollen v. United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993) is misplaced. The taxpayer in Mollen was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical Association, led a continuing medical education (CME) accreditation program for local hospitals. The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership which invested in the production, marketing, and distribution of medical educational video tapes. The District

---

[13] Carmagnola has not been called to testify in any of the Plastics Recycling cases before us.

Court found that the taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable.  Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer regarding those matters.  Moreover, the District Court noted that the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable."  See Zfass v. Commissioner, T.C. Memo. 1996-167.

The records in these cases show that none of petitioners or their supposed advisers had any formal education, expertise, or experience in plastics or plastics recycling.  None of them had any personal insight or industry know-how in plastics recycling that would reasonably lead them to believe that the Partnership transactions would be economically profitable.  The extent of Tomasetti's, Frabotta's, and Omohundro's "investigation" was a tour of PI's plant in Hyannis and a discussion with PI personnel and insiders to the Partnership transactions.  No independent experts in the field of plastics or plastics recycling were consulted by any of petitioners or their advisers.  The facts of these cases are distinctly different from those in the Mollen case.  Thus, we consider petitioners' arguments with respect to the Mollen case inapplicable under the circumstances of these cases.

Petitioner's arguments are not supported by the Ninth Circuit Court of Appeals' partial reversal of our decision in

Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, ___ F.3d ___ (9th Cir. 1996). In Osterhout, we found that certain oil and gas partnerships were not engaged in a trade or business and sustained respondent's imposition of the negligence additions to tax with respect to one of the partners therein.[14] The taxpayer had relied in part upon a tax opinion contained in the offering materials. The Ninth Circuit Court of Appeals reversed our imposition of the negligence additions to tax. Based on the Court of Appeals for the Ninth Circuit's partial reversal of our decision in Balboa Energy Fund 1981, petitioners argue that their reliance upon the offering materials concerning their investments in Northeast and Hyannis was reasonable and therefore sufficient to overcome the additions to tax for negligence. The Court of Appeals for the Ninth Circuit's opinion is unpublished, however. Moreover, the prefaces to the offering memoranda for Northeast and Hyannis warned prospective investors that the tax opinion letter was not in final form, and was prepared for the general partner, and that prospective investors should consult their own professional advisers with respect to the tax benefits and tax risks

---

[14] Osterhout v. Commissioner, T.C. Memo. 1993-251, involved a group of consolidated cases. The parties therein agreed to be bound by the Court's opinion regarding the application of the additions to tax provided for under sec. 6653(a), inter alia. Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the parties.

associated with the Partnership. The tax opinion letter was addressed solely to the general partner and contained the following opening disclaimer:

> This opinion is provided to <u>you for your individual guidance</u>. <u>We expect that prospective investors will rely upon their own professional advisors</u> with respect to all tax issues arising in connection with their investment in the Partnership and the operations thereof. We recognize that you intend to include this letter with your offering materials and we have consented to that with the understanding that <u>the purpose in distributing it is to assist your offerees' tax advisors in making their own analysis and not to permit any prospective investor to rely upon our advice in this matter</u>. [Emphasis added.]

Accordingly, both the offering memoranda and the tax opinion letter expressly and unambiguously indicated that prospective investors such as petitioners were not to rely upon the tax opinion letter. The limited, technical opinion of tax counsel in these cases was not designed as advice upon which taxpayers might rely and the opinion of counsel itself so states.

Petitioners also argue, in general terms, that they were reasonable in claiming the deductions and credits related to the Partnerships because of rising oil prices in the United States in 1981. In support of this argument, petitioners testified that the conventional wisdom at the time was that oil prices would rise; petitioners also placed into the record several articles from Modern Plastics and an energy projections report from the U.S. Department of Energy (DOE), all published in the years 1980 and 1981. Petitioners also cite <u>Krause v. Commissioner</u>, 99 T.C. 132 (1992), affd. sub nom. <u>Hildebrand v. Commissioner</u>, 28 F.3d

1024 (10th Cir. 1994), and <u>Rousseau v. United States</u>, 91-1 USTC
par. 50,252 (E.D. La. 1991).

The articles from Modern Plastics and the report by the DOE
speculated on the price of oil, among other matters.  The preface
to the DOE report cautioned about "the tremendous uncertainties
underlying energy projections" and warned "that [their]
projections do not constitute any sort of blueprint for the
future."  Reflective of such uncertainties, an April 1980 article
in Modern Plastics contemplated resin price hikes, while a May
1981 article predicted a leveling off of prices, market
disruptions, and an industrywide shakeout.  Petitioners do not
purport to have read, or in any way relied upon, the DOE report
or the Modern Plastics articles, and have not otherwise explained
the connection between these speculative materials and their
investments in the Partnerships.  Indeed, while Cote testified
that he saw a correlation between resin pellets, an oil-based
product, and the price of oil, he could not "recall ever making a
direct connection between those two".  Petitioners' vague,
general claims concerning the so-called oil crisis are without
merit.

Petitioners' reliance on <u>Krause v. Commissioner</u>, <u>supra</u>, is
misplaced.  The facts in the <u>Krause</u> case are distinctly different
from the facts of these cases.  In the <u>Krause</u> case, the taxpayers
invested in limited partnerships whose investment objectives
concerned enhanced oil recovery (EOR) technology.  The <u>Krause</u>

opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in the Krause case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology." Id. at 177. In the present cases, however, one of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil, that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products." While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

Moreover, the taxpayers in the Krause opinion were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the Krause case undertook significant investigation of the proposed investment

including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. In the present cases, none of petitioners has any education or work experience with respect to plastics or plastics recycling. Petitioners did not independently investigate the Sentinel EPE recyclers, nor did they hire an expert in plastics to evaluate the Partnership transactions. Petitioners' arguments with respect to the Krause case are inapplicable here.

Petitioners' reliance on Rousseau v. United States, supra, is similarly misplaced. In Rousseau, the property underlying the investment, ethanol producing equipment, was widely considered at that time to be a viable fuel alternative to oil and its potential for profit was apparent. In addition, the taxpayer therein conducted an independent investigation of the investment and researched the market for the sale of ethanol in the United States. In contrast, as we noted in distinguishing the Krause case, there is no showing in these records that the so-called oil crisis would provide a reasonable basis for petitioners' investing in the polyethylene recyclers here in question. Petitioners did not independently investigate the Sentinel EPE recyclers or hire an expert in plastics to evaluate the Partnership transactions. The facts of petitioners' cases are distinctly different from the Rousseau case. Accordingly, we do

not find petitioners' arguments with respect to the Rousseau case applicable.

Under the circumstances of these cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their respective Federal income tax returns. We hold that petitioners did not reasonably rely upon Tomasetti, Frabotta, or Omohundro and the offering memoranda, or in good faith investigate the underlying viability, financial structure, and economics of the Partnership transactions herein. It is clear from Tomasetti's testimony that he was concerned with the inflated values placed on the recyclers, that he communicated his concerns to his clients, and that all petitioners were made aware of his views with respect to the Plastics Recycling deal. We hold, upon consideration of the entire records, that petitioners are liable for the negligence additions to tax under the provisions of section 6653(a) for 1980 and section 6653(a)(1) and (2) for 1981. Respondent is sustained on this issue.

Issue 2. Section 6659 Valuation Overstatement

Respondent determined that petitioners were each liable for the section 6659 addition to tax on the portion of their respective underpayments attributable to valuation overstatement. Petitioners have the burden of proving that respondent's determinations of these section 6659 additions to tax are

erroneous.  Rule 142(a); <u>Luman v. Commissioner</u>, 79 T.C. 846, 860-861 (1982).

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement.  Sec. 6659(a), (d).  A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount.  Sec. 6659(c).  If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment.  Sec. 6659(b).

Petitioners each claimed an investment tax credit and a business energy credit based on the following purported values for each Sentinel EPE recycler:  $1,162,666 in the Northeast transaction and $1,066,666 in the Hyannis transaction.  Petitioners each concede that the fair market value of each recycler was not in excess of $50,000.  Therefore, if disallowance of petitioners' claimed credits is attributable to the valuation overstatements, petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the respective underpayments of tax attributable to the credits claimed with respect to the Partnerships.

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements.  See <u>McCrary v. Commissioner</u>, 92 T.C. 827 (1989); <u>Todd v. Commissioner</u>, 89 T.C.

912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).  To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements.  Krause v. Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v. Commissioner, supra), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994).  However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable.  See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

In the respective stipulations of settled issues, petitioners concede that they "are not entitled to any deductions, losses, investment credits, business energy investment credits, or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program."  In Todd v. Commissioner, supra, and McCrary v. Commissioner, supra, we denied application of section 6659, even though the subject property was overvalued, because the

related deductions and credits had been conceded or denied in their entirety on other grounds. In <u>Todd</u>, we found that an underpayment was not attributable to a valuation overstatement because property was not placed in service during the years in issue. In <u>McCrary</u>, we found the taxpayers were not liable for the section 6659 addition to tax when, prior to the trial of the case, the taxpayers conceded that they were not entitled to the investment tax credit because the agreement in question was a license and not a lease. In both cases, the underpayment was attributable to something other than a valuation overstatement.

This Court has held that concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. <u>Dybsand v. Commissioner</u>, T.C. Memo. 1994-56; <u>Chiechi v. Commissioner</u>, T.C. Memo. 1993-630. Instead, the ground upon which the investment tax credit is disallowed or conceded is significant. <u>Chiechi v. Commissioner</u>, <u>supra</u>. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. <u>Gainer v. Commissioner</u>, 893 F.2d 225, 228 (9th Cir. 1990), affg. T.C. Memo. 1988-416; <u>Irom v. Commissioner</u>, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part and remanding T.C. Memo. 1988-211; <u>Harness v. Commissioner</u>, <u>supra</u>.

In the present cases, no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the investment tax credits related to anything other than a valuation overstatement. To the contrary, petitioners stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, T.C. Memo. 1992-177. In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers. The overvaluation of the recyclers, exceeding 2325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance. Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that the underlying transactions here were shams and lacked economic substance.

Consistent with our findings in Provizer, petitioners respectively stipulated that the Northeast and Hyannis transactions had no net equity value, that the sole activity of the Northeast and Hyannis partnerships lacked any potential for profit, and that the Northeast and Hyannis partnership transactions therefore lacked economic substance. When a transaction lacks economic substance, section 6659 will apply because the correct basis is zero, and any basis claimed in excess of that is a valuation overstatement. Gilman v.

Commissioner, supra; Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

We held in Provizer v. Commissioner, supra, that each Sentinel EPE recycler had a fair market value not in excess of $50,000. Our finding in the Provizer case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our finding of a lack of economic substance. Petitioners conceded that the Northeast and Hyannis transactions were similar to the Clearwater transaction described in Provizer v. Commissioner, supra, and that the Northeast and Hyannis transactions lacked economic substance. Given those concessions, and the fact that the records here plainly show that the overvaluation of the recyclers was the reason for the disallowance of the tax benefits, and the fact that no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the tax benefits related to anything other than a valuation overstatement, we conclude that the deficiencies caused by the disallowance of the claimed tax benefits were attributable to the overvaluation of the Sentinel EPE recyclers.

Finally, we consider petitioners' express arguments as to waiver of the addition to tax under section 6659. On brief,

petitioners each contested imposition of the section 6659 addition to tax on the grounds that respondent erroneously failed to waive the addition to tax. Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatement if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith. Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion. Krause v. Commissioner, 99 T.C. at 179.

Petitioners urge that they relied on the offering memoranda and, in varying degrees, Tomasetti, Frabotta, and Omohundro in deciding on the valuation claimed on their tax returns. Petitioners each contend that such reliance was reasonable and, therefore, respondent should have waived the section 6659 addition to tax. Petitioners cite Krause v. Commissioner, supra; Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23; and Rousseau v. United States, 71A AFTR 2d 93-4294, 91-1 USTC par. 50,252 (E.D. La. 1991), in support of their argument.

We have found that petitioners' purported reliance on Tomasetti, Frabotta, and Omohundro, in addition to the offering memoranda, was not reasonable. None of petitioners, their supposed advisers, nor anyone affiliated with them was educated or experienced in plastics or plastics recycling. The evaluators

whose reports were appended to each of the offering memoranda each owned interests in partnerships which leased Sentinel EPE recyclers. The offering memoranda contained numerous caveats, including the following: NO OFFEREE SHOULD CONSIDER THE CONTENTS OF THIS MEMORANDUM *** AS *** EXPERT ADVICE. *** EACH OFFEREE SHOULD CONSULT HIS OWN PROFESSIONAL ADVISERS. Petitioners did not see a Sentinel EPE recycler prior to investing in Northeast or Hyannis, nor did they independently investigate the recyclers. They only went so far as to have an accountant and two bond dealers, all lacking any training or experience in plastics or recycling, look at the machines and the factory which produced them. In effect, petitioners went so far as to find out whether some sort of machine existed and not much farther.

Petitioners' reliance on Krause v. Commissioner, supra, Rousseau v. United States, supra, and Mauerman v. Commissioner, supra, in support of their contentions that they acted reasonably, is misplaced. In the Krause and Rousseau cases, the section 6659 addition to tax was disallowed in light of the respective holdings that the taxpayers in each case had a reasonable basis for the valuations claimed on the tax returns or had reasonable cause for the understatements on the returns and were not subject to negligence additions to tax. In contrast, we have held that petitioners herein did not act reasonably in claiming deductions and investment tax credits related to the Partnerships, that the errors on petitioners' tax returns were

caused by the excessive valuations of the underlying machinery in the Partnership transactions, that petitioners lacked reasonable cause for such overvaluation, and that each petitioner is therefore liable for the negligence additions to tax under section 6653(a).  Accordingly, petitioners' reliance on the Krause and Rousseau cases is misplaced.

In Mauerman, the Tenth Circuit Court of Appeals held that the Commissioner had abused her discretion for not waiving a section 6661 addition to tax.  Like section 6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith.  Sec. 6661(c).  The taxpayer in Mauerman relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized.  The advice relied upon by the taxpayer in Mauerman was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In these cases, particularly with respect to valuation, petitioners relied upon advice that was outside the scope of expertise and experience of their supposed advisers. Consequently, we consider petitioners' reliance on the Mauerman case inapplicable.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations reflected on their tax returns with respect to their investments in Northeast and Hyannis.  In

these cases respondent properly could find that petitioners' reliance on Tomasetti, Frabotta, and Omohundro, in addition to the offering materials, was unreasonable. The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position. We hold that respondent's refusal to waive the section 6659 addition to tax is not an abuse of discretion. Petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed tax benefits. Respondent is sustained on this issue.

Decisions will be entered
under Rule 155.